IN 1767, William Byrd, by advertisements in the gazette, published his intention to dispose, by lotery, twenty nine improved tenements, of which one, called John M’Keands, valued at one hundred and forty four pounds, was demised to that tenent at the yearly rent of twelve pounds, and eight hundred and ten unimproved parcels of land, whereof one hundred contained one hundred acres each, others half an acre each, and some were islands, the estates lay at and near the foils of James river.
Before the lotery was drawn, William Byrd was preparing to survey the lands, designing to mark the boundaries of the tenements, and half acres, and so to delineate them as that they might form a town on each side of the river, with convenient streets for passage.
Some of the tenents opposed the execution of this design, alledging it would derange their tenements, and threatening,, if William Byrd persisted in it, to return the tickets which they had taken to sell for him.
Whether John M’Keand, the holder of the tenement called by his name, joined in the opposition doth not appear, that he did not join is most probable, because he neither occupied nor clamed more ground than the area of his dwelling house.
The survey was not then prosecuted, if begun.
Some time afterwards, whether the tenents who had heeif adverse to the mensuration and delineation were now reconciled to it, or whether they knew not oí it, or connived at it, William Byrd procured the lands to he surveyed, laying oif for John M’Keands tenement half an acre, and plans of the towns to be drawn, which were hung up, exposed to public view, in one part of the old capítol in Williamsburgh, and remained so exposed during the time the managers superintended the drawing’'of thelotery, in another part of the same house, in november, 1768.
A ticket owned by the plaintiff won the prize marked 327, Which by recurrence to the plan appeared to be John M’Keands tenement. /
How much-land, more or less than half an acre, was contained in this tenement, before he was a tenent of it, does not appear, he did not cultivate any part of it, as hath been observed-if all the parts occupied by the preceding tenents, with some other ground not actually cultivated but situated so that it could not have been excluded, were included in. one figure, the area would be more than half an acre-but such a figure would not coincide with any street, or with the lines of *97 coterminous grounds drawn prizes by other ad venturers — must have been an irregular polygon, inconvenient to the fortunate adventurer himself, as well as to his neighbours — moreover, if the tenement had been surveyed in such a manner as to include the grounds only which had been actually occupied by any one tenent, before John M’Keand, that it would have exceded half an acre doth not appear — neither doth the part, which had. not been actually occupied, but which is included in the survey, appear to be less than the occupied part, which is excluded— iinaiy, the plaintiff intitled confessedly to John M’Keands tenement, for which a rent of twelve pounds was annualy paid, actualy possessed), lor his prize, all the tenement which John M’Keand ever occupied or ever clamed, and for which he paid that rent, and almost half an acre more.
Nevertheless, the plaintiff, 14 years and a half so many months, after the lotery was drawn, and almost as long after the land now clamed by him, for part of John M’Keands tenement, was possessed and improved by other men, and had been transferred for valuable consideration oflcuer than once, brought a bill, in the county court of Henrico in chancery, to vindicate his title, and to compel the defenders Charles Carter, in whom the legal estate rested, to convey it to the plaintiff.
The defendents John M’Keand and John Mayo, at that time the only interested defendents, answered the bill; and many witnesses were examined, their testimony was chiefly to prove the situation of the ground in dispute which had been cultivated by three men, Letcher, Woodson, and Gunn, tenants who had lived in the house which, in 1767, and for the two next preceding years, was the dwelling house of John M’Keand, before it was called his tenement, — that a horse-rack was on the land in dispute, on the pins of which people, who frequented this place where a tavern was then kept, and those who came to a public tobacco inspection, called Byrds warehouse,’in the neighbourhood, used to hitch the bridle reins of their horses — that a cockpit was dug by Gunn, whilst he kept the tavern, on part of the land in dispute — to prove that a tree stood some where or other, upon the warehouse ground, or the ground in dispute, or between them, where the inspectors used to prize tobacco, — -to prove the situation of the place which the people, bringing tobacco to the warehouse, used lor a way — to prove that the plaintiff gave notice of his title to M’Keand when he bought the land in dispute from William Byrd, and that he had, some time before the war, applied to couusil to assert his title.
The county court dismissed the bill.
The high court of chancery, to which the plaintiff appealed,, *98 directed an issue to he tried, in order to determine the boundaries of John M’Keands tenement, and a survey of the land in controversy to he made and reported to the court before which the issue should be tried, and also directed the copied plan of Richmond, to which the plaintiff excepted, to be admitted in evidence at the trial.
The jury who tried the issue by their verdict found the boundary of the tenement to he that which agreed with' the survey and plan of the town of Richmond, which was in effect a verdict in favour of the- defendents.
The court, before which the issue was tried, certified the weight of evidence to be in favour of the plaintiff, and that the only evidence offered at the trial.was the written testimony (that is the testimony which was before the court of chancery) and! the oral testimony of James Vaughan- and James Price', whose written examinations were Likewise‘before the court of chancery, and who are not alledged to have deposed any thing more when they were examined viva voce-..
The high court of chancery,-on. the first day of march, 1791,. delivered the following opinion and- decree :
‘ The court is of opinion, that a survey and plan of the parcels of land, to be prizes in the lotery, from which this controversy arose, was a necessary part of that scheme,- as- well for laying off the ground in convenient figures-, as for indicating the situations, ascertaining the quantities, and defining the boundaries-of them ; that the survey and plan thereof, made for those purposes, was not fraudulent as to any purchasers of tickets ; especially as probably all those tenements, exceeding half acres, the holders of which objected to divisions of them, were .laid off intire ; as, at the time of drawing the lottery, the plan, suspended in a public place, was exposed to the view of all who ■would look upon it; and as, for any thing shewn to the contrary, all parties, until the lotery was drawn, yea all parties except the appellant, even afterwards, acquiesced in that plan, as an authoritative terrier ; that the tenements, denominated in the scheme Byrds and M’Keands, which are contiguous, laid off' by the plan in parallelograms, were so much more commodious than the figures, into which an inclusion of the ground clamed by the appellant in the latter tenement any way-would throw them, that the court believes the adventurers, if they could have been consulted before the drawing of the lotery, would have approved that mad© of laying them off; that the ground cultivated or occupied by any holder of M’Keands tenement, doth not appear to have exceded much, if at all, at any time, in quantity, or, before the buildings erected on it, in value, the ground assigned *99 to that tenement by the plan ; that the plan ought to hind the appellant, because by that alone he can clame, not only the lot which was drawn a prize against the ticket numbered 1158, (a) and so much of what is called M’Keands tenement in the plan as lieth between the southern end of the house in which he dwelled, and the said lot adjoining to it, no part of which interjacent ground appeareth to have been cultivated or otherwise occupied by M’Keaud or any tenent before him, hut even M’Keands tenement,, however bounded, since by the figures 326, (b) on the paper drawn against the appellants ticket numbered 5187, refering to the plan in which those figures are found, that ticket is shewn to he fortunate, and the original plan having been probably destroyed, the copy, among the exhibits, mentioned in the examination of Janies Lyle, is sufficiently proved to he correct, by the testimony, by the appearance of the thing itself, and by its congruity with the printed list of fortunate numbers, exhibited by the appellant, which was taken from the plan: (c) and therefore the court, approving the said verdict, which findeth the line B G in the surveyors plot to be .the boundary, dividing Byrds inspection -and M’Keands tenement, rejecting a motion, made last term and repeated in this, for a new trial of the issue, and being of opinion that the ap¡peHant.is-not intitled in equity to the land clamed by him, doth adjudge order and decree that .the decree of the county court, by which was decreed and ordered that the bill of the appellant ¡be dismissed, and that he pay to the appellees their costs, be affirmed, as it is hereby affirmed, and that the appellant do pay ito the appellees the costs expended by them in their defense, including the costs of the trial before the district court.’
The court of appeals, before whom the case was carried, on the 6 day of november, 1794, delivered the following
OPINION AND DECREE.
■' The court, having maturely considered the transcript of the record, and the arguments of the counsil, is of opinion, that the verdict in the district court ought not to be considered as settling the bounds of the ground in dispute, since the same is certified *100 by tbe judge to have been given against the weight of evidence ; but that the decision ought to be made upon the proofs and exhibits in the cause ; that, under the- scheme published by William Byrd, esquire, the adventurers in the lotery had a right to expect, in the prize called M’Keands tenement, all the ground that had been occupied, as part thereof, which occupation ought rather to be collected from that of former tenents? who kept a public tavern on the tenement, which- drew the attention of the public thereto, than from that of M’Keand, a private single man, who had not occasion to occupy the whole, and that the occupation of such former tenents extended so as to include the ground in dispute; that the survey made by-Benjamin Watkins, at the instance of the said Byrd, after the-publication of the scheme, by which the bounds of the tenement are supposed to be narrowed, ought not to affect the interest of the appellant, since neither he nor M’Keand, the tenent at the time, appear to have been present, so as to imply the consent of either, that the occupied bounds should be changed ; nor is -such implied consent in the appellant to be infered from the exposure of that plan in the room were the lotery was drawn,, even if he had read it, which does not appear ; since he could not from thence discover whether the tenement was described therein according to the occupied bounds or not; and therefbreit is unnecessary to decide how far the copies from that plan ought to be admitted as evidence; that the appellant, being thus intitled to the ground in dispute, and M’Keand a purchaser" with full notice of that title, if the appellant had prosecuted his clame immediately, and M’Keand had proceded in improving' the ground, he would probably have lost both together; but-since the appellant did not prosecute any suit til after great improvements had been made, under the idea, as is to be presumed,, that the clame was abandoned, it would be unreasonable for the' appellant to take advantage of his own delay, to avail himself of those improvements ; and therefore his clame ought to be reduced-to the value of the ground, as it stood at the time M’Ke- and purchased, for which value the tenement would have been considered as charged so long as it continued’ in M’Keands. possession, and to have been so charged in the hands of a purchaser with notice ; but since it appears the appellee-Mayo holdg under his father, who was a purchaser without notice, the ground in his hands is discharged ; and that there is no error in so much of the decree of the county court, nor in so much of the decree of the high court of chancery in affirmance thereof, as dismisses the appellants bill, as to that appellee, -with; costs ; but that there is error in the said decree, so far as the bill is dismissed as to the said M’Keand, who was answerable to the ap *101 pel] ant for the value of the ground, as before mentioned; therefore it is decreed and ordered, that so much of the said decrees as relates to the 'appellee Mayo be affirmed, that the appellant pay him his costs by him about his defense in this behalf expended ; that the residue of the said decrees he reversed and annulled, and that the appellants costs in this court be paid him by the executors or administrators of the said M’Keand, out of his estate, if so much thereof they have in their hands, the court would have proceeded to make such decree as the said court of chancery should have pronounced, to wit, that an issue should he made up, by direction of the said court of chancery, and tried by a jury, to ascertain what was the value of the ground in dispute, on the 26 day of july, 1779, independent of any improvement made thereon subsequent to the 8 day of October, 1769, which being ascertained should be paid to the appellant out of M’Keands estate, with interest on such value from the 26 day of July, 1779, together with the appellants costs in chancery and the county court; but the said M’Keaud having died pending the appeal in this court, although the same hath been revived by consent of parties as to his heirs and representatives in their general character, without naming them, it is judged necessary they should respectively bo made specific parties, that they may discover a state of the said M’Keands assets real and personal, in case there should not be sufficient of the latter to satisfy this demand : therefore the cause is remanded to the high court of chancery, tor the suit to he revived there against his executors or administrators, as well as the heirs ■or devisees of his real estate, and further procedings to be had therein, in order to such final decree.’
COMMENTARY.
The verdict in the district court ought not to he considered as .settling the bounds of the ground in dispute, since the same is certified by the judge to have been given against the weight of evidence;] if the judge of the high court of chancery have the same evidence before him which was before the district court, as was the case here, and shall happen to differ in opinion with the judge of that court, as was likewise the case here, being of opinion that the weight of evidence was in favour of the defend ents, to evince the rectitude of which opinion will be attempted anon, what ought the judge of the court of chancery to do ? ought he, disregarding the verdict, and not only resigning but contradicting his own opinion, to form such a decree as will accord with the sentiments of the district judge? ought he to award another trial? and that toties quoties? if, upon *102 another-trial, before a different judge, lie and the jury should-change sides, or if the court should-certify the evidence to have-been in equilibrio, so that it would justify a verdict in favour of either party, of which one example is extant; what course ought the court of chancery to persue ? * to these questions a fit answer perhaps occurs in the next words :
But that the decision ought to be made upon the proofs and exhibits in the cause.] be it so.
That under the scheme, published by 'William Byrd, the adventurers in the lotery had a right to expect, in the prize called MlKeands tenement, all the ground that heed been occupied, as part thereof f] these terms, notwithstanding the seeming plenitude of their sense, are so defective that, until an ellipsis be supplied, a fair reasoner might neither yield nor withold his assent to the truth of the proposition, which they now exhibit, the ellipsis is of the occupier, so that whether he were Letcher, ■ or Woodson, or Gun, or M’Keand, or whether the occupiers were all the three former, or any two or one of them, is uncertain. if it be supplied so that the proposition be read thus : e under the scheme, published by William Byrd, the adventurers in the lotery had a right to expect in the prize, called M’Keands tenement, all the ground that had been occupied by Letcher, Woodson and Gun, or any two or one of them, whilst they were tenants of the house which John R'l’Keand afterwards held,’ the truth of the proposition is denied. 1, because the exhibit, to which the reversing decree refereth to prove the truth of the proposition, will be hereafter shewn to prove the contrary. 2, because the occupations of the land in dispute are not proved to have been so uniform and permanent as that the said occupied land could be truly said either in the technical or popular sense to be appertinent to the house in which John M’Keand afterwards dwelled. 3, whether the cultivating tenants had any kind of title to the ground which they cultivated doth not appear, that they were intitled to what is called a curtilage may rationaly be supposed ; but this term is believed to comprehend only those accommodations which are convenient to mere indwellers, such as a way, a yard, and some others.
Again ; the word 1 thereof’ is put for ( M’Keands tenement.’ if then these terms be put in the place of their representative *103 4 thereof,5 the proposition will be read thus : ‘ under the scheme, the adventurers had a right to expect, in the prize, called M ’Keands tenement, all the ground that Letcher, Woodson and Gun had occupied, as parts of M’Keands tenement;’ that is, the adventurers had a right to expect, in the prize, called M’Keands tenement, in 1767, all the ground that Letcher, Woodson and ■Gun, several years before it was M’Keands tenement, had occupied, as part of M’Keands tenement.
If the proposition be read thus : £ under the scheme, published by William Byrd, the adventurers in the lotery had a right to expect in the prize, called M’Keands tenement, all the ground that had been occupied by John M’Keand, as part thereof,’ the truth of the proposition is admitted — then let us appeal to the sfehemo, the exhibit to which the reversing decree refereth to prove the other sense — £ i will dispose,’ says William Byrd, £by lotery, twenty nine improved lots, among them, John M’Keands tenement, for which he payeth me twelve pounds annual rent.’ now the tenement, for which John M’Keand paid twelve pounds annual rent, was a house, and nothing but a house, the whole description of that prize, offered to the adventurers by the scheme, therefore, was verified in the house, without the ground: so that William Byrd, by annexing ground to the house, gave more than the adventurers had a right to expect.-besides no proof is exhibited of the rents paid by the predecessors of John M’Keand. that occupying ground, as well as the house, they paid more rent than he piid, who occupied one of the subjects only, is presumable, if it be presumable, and if the description of the prize offered to the adventurers, by the appellation of John M’Keands tenement demised for the annual rent of twelve pounds, he more than completely verified, as it certainly is, no reason can be assigned for extending that description, as the reversing decree hath extended it, according to which it must he understood as' if it had been in these, or some such terms : ‘ the tenement formerly Letchcrs, afterwards Woodsons, lately Guns, now John. M’Keands, worth 144 pounds, and rented at 12 pounds,’ an interpolation which seemeth unjustifiable, and the more unjustifiable if the value of the house with the occupied land exceded one hundred and forty four pounds, or if the annual rent thereof exceded twelve pounds.
Which occupation ought rather to be collected from that of former tenents, who kept a public tavern on the tenement, which drew the attention of the public thereto, than from that of Ke- and a private single man who had no occasion to occupy the whole that is, which occupation by Letcher, Woodson and Gun of ground near the house in which they lived before John *104 M ’Keand, ought rather to be collected from, the occupation of those tenents, than from the occupation of M’Keand, who occupied no part of the ground, except that on which the house stood, undoubtedly.
And that the occupation of such former tenents extended, so as to include the ground in dispute:] if the occupation of former tenents did extend so far, this will not prove the plaintiffs title to the ground in dispute, unless his title be proved to all the ground which those former tenents occupied.
That the survey made by Benjamin Watkins, at the instance, of the said Byrd, after the publication of the scheme by which the bounds of the tenement are supposed to be narrowed, ought not to affect the interest of the appellant, since neither Its nor dMd Keand, the tenent, at the time, appears to have been present so as to imply the consent of either that the occupied bounds should be changed f\ without a survey and plan or map, how could the lotery, that is, such a.lotery as was proposed by William Byrd, and expected by the adventurers, have been drawn ? .how could any man .know whether a prize were an improved tenement, or one hundred acres, or half an acre of bare land, or whether it were on this or that side of the river, or whether it were on neither? must not the fortunate adventurers have divided among them the prizes equaly, which was never designed, or have divided them by another lotery, inconsistently with the original proposal, according to which the destiny of every ticket ought to have been decided by a single sortilege ?
A survey and map then, if without them the lotery could not have been drawn in the manner proposed, were necessary ; as in the reversed decree are stated to have been, if they were necessary, to give them efficacy, consent of the ticket holders, if their consent could not have been obtained, was unnecessary. for that an act, the performance whereof was necessary, shall not be valid, without the intervention of something which is impossible, is. denied ; the terms of the proposition implicating this absurdity, that what must be done shall be a nullity after it is done.
And the impossibility to obtain the consent in question, that is, the consent of all the holders of tickets, for the consent of every other was necessary, if the consent of the plaintiff were necessary, will perhaps be confessed by every candid man, who adverts to thé number of people interested in ten thousand tickets, the dispersed’places of their residence, the number of those who sold the tickets, not fewer than ten having been first nominated for that office, the multifarious transfers of tickets, the sales of tickets after the survey, and among them possibly the *105 plaintiffs ticket, and other impediments to procuring the consent too many to bo enumerated easily.
If William Byrd had indeed narrowed the bounds of the tenements, in such a maimer that they did not contain the quantities of ground, for which tenants paid the rents published in the advertisement, he would undoubtedly have done wrong, that he narrowed the bounds of John M’Keands tenement perhaps must, not be now denied, but if he narrowed the bounds, that he did it ignorantly and without design to injure any man is most probable ; because the ground, of which the abscission is supposed, was not, by the survey and map, made a separate lot, by which, being proprietor of the soil, he might have been a gainer, but, instead of being included in John M’Keands tenement, was included in Byrds warehouse tenement, by which he couLd not have been a gainer, otherwise than as a fortunate adventurer, he was indeed that fortunate adventurer, but, at the time of the survey, that the ticket, against which Byrds warehouse tenement was drawn a prize, would be left upon William Byrds hands or would be fortunate, could not be known, if any other man, instead of William Byrd, had drawn the warehouse tenement, the plaintiff, as is supposed, could not have recovered the ground in dispute, but, if he were injured by the survey, must have clamed a reparation from William Byrd, and that is thought to bo the only remedy to which the plaintiff was intitled, if he were intitled to any remedy, in the principal case.
By the words ‘ the survey ought not to affect the interest of the appellant, since neither he nor M’Keand, the lenent at the time, appears to have been present, so as to imply the consent of either, that the occupied bounds should be changed, those who used them are supposed to have implicitly‘conceded, that the survey, if either the plaintiff or M’Keand had been present, so that his consent might have been implied, would have affected the interest of the plaintiff, the concession is supposed, because it is believed to be unavoidable, that the survey then, made with consent of John M’Keand, would have affected the interest of the plaintiff, that is, would have bound the plaintiff to abide by the survey, being granted; if such an obligation could not have been wrought by such a consent, the obligation, which is admitted to exist with the consent, exists without it, for the absence of that, which, if present, would not produce or preserve a thing, cannot prevent or terminate its existence, now the consent of John M’Keand to the survey could not have bound James Southall to abide by the survey, unless James Southall had authorised M’Keand to consent to it, or derived the right, *106 which he endeavoured to assert, from John M’Keand ; neither of which is pretended, however, that the consent of John M’Keand to the survey should be doubted seemed impossible before the reversing decree, bemuse, 1, no reason for his dissent is assignable ; 2, he hath been claming under the survey, and endeavouring to prove the validity of it, ever since it was made, and doth not appear to have objected to it at any time.
Nor is such implied consent in the appellant to be inferedfrom the exposure of that plan in the room where the lotery was drawn, even if he had read it, which does not appear^ if, because he doth not appear to' have read the plan, the evidence of his consent to the survey be defective, it seems defective in two other instances : first, that he could read doth not appear ; secondly, that he understood what he read doth not appear.
Since he could not from thence discover whether the tenement was described therein according to the occupied bounds er not the court of appeals seem to have supposed that, against the paper, having the same number with that of the plaintiffs ticket, was drawn another paper, on which were written the words John M’Keands tenement; which, without reference to any map, was sufficient to point out his prize, upon which supposition the transaction between William Byrd and the plaintiff, the terms thereof being translated into the language of a solemn agreement, would be exhibited in this or such like form ; ‘ in consideration of five pounds, received from James Southall, to whom is delivered a ticket, numbered 5187, if against a paper, on which that number shall be inscribed, be drawn a .paper, whereon shall be written the words ‘ John M’Keands tenement,’ i, William Byrd, oblige myself to convey the title of the said tenement, called John M’Keands, by whatever bounds it ought to be limited, to the said James Southall.’ but that any paper, on which were writen ‘ John M’Keands tenement,’ was drawn, is not proved ; the contrary is presumable, from the ordinary course of proceding in similar cases, which is, by numerical characters on the papers drawn, to refer to some catalogue, where particular descriptions of the prizes may be found —and, not only presumable but, proved undeniably by the list of fortunate numbers published by the managers, the very exhibit on which the plaintiff chiefly relied, and which concludes thus : (N. B. in the first column of figures are the numbers of the tickets, in the second the NUMBER to each prize.’— this being the case then, the compact between William Byrd and the plaintiff is exhibited truly in this form : ‘ in consideration of five pounds, received from James Southall, to whom is delivered a ticket numbered 5187, if against a paper whereon *107 that number shall be inscribed, be drawn a paper, which is marked with the characters 327, i, William Byrd, oblige myself to convey to the said James Southall the title of a parcel of land, represented in the map of Richmond, by that diagram, which is marked with the characters 327, and on which is written the word M’Keands.’ if this be correct, the plaintiff, when he quarreled with the plan, excepting to the admisión of it in evidence, was thought ungrateful to a benefactor, and is thought so still, by one, who is not enough enlightened by the reversing decree, nor enabled otherwise, to discover that, without the aid of the plan, the plaintiff could have shewn any title whatever to the tenement now holden by him for M’Keands.— how, with the aid of the plan, the title might have been shewn, and probably was shewn, will be explaned.
In the mean time, let one ask if that part of the reversed decree, which stales part of the land included in M’Keands tenement by the survey never to have been cultivated or otherwise occupied by M’Keand or any tenant before him, deserved to have been totaly neglected in the other decree? ought the plaintiff to recover the value of the land which had been occupied by the former teneuts, in right of that occupation, and in violation of the survey, and yet retain the ground which had not been occupied by those tenants in right of that survey !
And therefore it is unnecessary to decide how far the copies from, that plan ought to be admitted as evidence:] a hearer of the reversing decree, convinced perhaps by the preceding parts of it, may yield assent to this part, in which the plan of Richmond, even if the original were produced, is treated as a tabula rasa, merely because a certain James Southall, owner of one ticket, which before the drawing of the lotery no man could know to be more the darling oí' fortune than any other of ten thousand tickets, DOES NOT APPEAR to have been present, when the lands represented in the plan were surveyed, or to have read the plan, suspended in the house where the lotery was drawn, at the time, or to have been able to discover from the plan whether the tenement called John M’Keands was described according to the occupied hounds, in opposition to this a man, who is not convinced, ventures to declare that, in his judgement, the plan alone, if admited to be evidence, is decisive of the question.
In shewing this, the copy exhibited by the defendents, may he taken to be a faithful exemplar of the original, not only because the proofs that it is so, explicitly stated in the decree of the high court of chancery, have not been controverted, but because those who reversed the decree, waiving that question, *108 have denied that the survey, represented by the plan, that is the original plan, if it were'produced, ought to affect the interest of the appellant, James Southall, or the interest, if not of him, of any other fortunate adventurer, an hypothetical argument may fairly be answered hypotheticaly
The case then may be stated, as to this question, thus :
' William Byrd owned the towns, as he called them, although the grounds do not appear at that time to have been disposed in lots and streets, of Rockyridge and Shockoe, the names of which were afterwards changed to Manchester and Richmond by which they are now distinguished, lying on opposite sides of the James, he also owned, other lands in the neighbourhood, within the limits of these towns and adjacent to them were twenty nine tenements, for which were paid by the holders of them certain annual rents, one .of these tenements was holden by John M’Keand who paid twelve pounds annual rent, occupying a house, but not any part of the land about it.
William Byrd published his intention to sell the inheritance of these lands to those'people who, paying the value of them, equal to fifty thousand pounds, would consent that the subjects to be sold, instead of being divided into so many parts as were equal to’ the number of purchasers, and being distributed so that every one of the later would be intitled to one of the former, should be divided into 839 parts or lots, in such a manner that every improved tenement should be one lot or prize, every hundred of ten thousand acres of land, situate • in this place, should be one lot or prize, and every half acre of the land situate in another place should be one lot or prize, and every one of certain islands should be a lot or prize. — that every purchaser should have one or more slips of paper called tickets, paying five pounds for each, on which were written, after the number, shewing its place in the arithmetical series of 1 to 10 000 inclusive, these words : ‘ this shall intitle the owner to such prize as shall be drawn against it, in W. Byrds lotery, 1767, W. Byrd.’ such a ticket, the number whereof was 5187, had the plaintiff.
For purposes explaned in the decree of the high court of chancery, William Byrd procured the lands to be surveyed and the situations and boundaries of them were represented in a plan, tickets were sold and in the hands of perhaps 2500, 3000 or more purchasers.
In order to determine which ticket would win a lot or prize, the managers appointed to superintend the drawing are supposed to have conducted the business in the following manner: 10000 other slips of paper, on which were written numbers corresponding with the numbers of the tickets holden by the purchasers, *109 were droped into a wheel, wherein was a cavity closed so that they would not fall out in revolutions of the wheel ; and into a similar wheel were droped slips of paper equal in number to the others, of which, 9101 were blank, no letter or signature being written on them, and the others were marked by the characters 839 inscribed on one, the character 1 inscribed on another, and characters significant of the numbers between those extreme -terms inscribed in a progressive order on the remainder.
When, from the wheels, after being turned for confusing their contents, the attendant upon each drew one paper, if that drawn from the prize and hi auk wheel were marked, the characters thereof were entered in a list opposite to the number on the paper drawn from the other wheel.
For example : when the paper numbered 5407 was drawn from one wheel, opposite to it were entered in the list the characters 301, on the paper drawn at the same time from the prize •and blank wheel: when the paper numbered 5187 was drawn from the former wheel, opposite to it were entered the characters 327 on the paper drawn at the same time from the later wheel: and so on until all the 839 characterized papers were exhausted.
The entries were in difierent columns, the column which contained the numbers corresponding with the numbers of the tickets shewed to the holders of those tickets that they were fortunate j and the other column, containing the characters on the papers drawn at the same time, refered the holders to some map, by which they could discover in what their felicity consisted ; so that this later column was nothing more than an index to that map in which corresponding characters would designate the prizeand that map was the plan in this case.
When therefore the paper numbered 5187 was drawn from one wheel, the characters 327, on the paper drawn from the other, refered to the plan which shewed the same characters there inscribed ; so that the plaintiff must have resorted to this very plan in order to intitle himself to the prize which his ticket won, and that would have been no more than the quantity represented in the plan.
But after the lotery was drawn, the managers, for information of the purchasers, published a list of fortunate numbers in this form:

N. B. in the first column of figures are the numbers of the tickets ; in the second the number to each prize.
*110 Every candid man will probably grant, without proof, that the ’managers, or their amanuensis, ip preparing this list, had recourse to the plan, for that they could otherwise know whenever a prize was drawn what it was ; or, if they could, that they would have suffered an enquiry, for obtaining the knowledge, to interrupt their progress in a business which must have employed them several weeks, cannot be supposed.
But the plaintiff, instigated by zealous friends, who discovered that the lines, including the lot 327, upon the area of which in the plan the surveyor had written the word M’Keand, would not include all the ground which had been occupied by that tenents predecessors, in order to assert his title to the surplus ground, waived the plan, as not binding upon him because he did not agree to the survey, and pretended to clame by the original scheme, and the publication of the managers, preposterously supposing the later to refer to that scheme, and not to the plan, whence one can scarcely doubt it was taken, and he hath been more succesfull than his counsil seemed to expect; for the original plan not being ostensible, they laboured to prove that the copy ought not to be admitted in evidence ; but, according to the reversing decree, the former, if admitted, would not hurt-him.
That the appellant being thus intitled to the ground in dispute and M’Keand a purchaser with full notice of that title, if the appellant had prosecuted his clame immediately, and M’Keand had proceded in improving the ground, he would probably have lost both together:] if the plaintiff could have vindicated his title in a court of common law, and there had prosecuted his remedy, and been as successful as he was in the court of appeals,’ M’Keand must have lost both together, unless the court of equity would have him relieved, so far as to award some kind of compensation, whether it would or would not have relieved him ? is a question which, when to determine it in some other case may become necessary, will seem to deserve consideration to one who reads what Home had said, on this question, in his principles of equity, part I. sect. II. art. I.
But however it might have been in that case, the plaintiff, for recovering what he clamed in this case, the title which only could demand audience in the court of common law, resting at this day in Charles Carter, one of the defendents, necessarily resorted to the court of equity; a court which requireth of its votaries that they perform that justice which they exact from others.
But since the appellant, Sfc. to the end of the paragraph.] *111 what law will authorize the application of John M‘Keands real estate, in the first instance, to supply the deficiency in his personal estate, to satisfy the damages which may he found, on trial of the issue to be directed ? perhaps the deficiency intended is what may be caused by discharging out of the personal estate demands chargeable on the real estate, can execution be awarded against the executors or administrators of John. M’Keand for the costs in the court of appeals? as they are now to be made parties must they not he convented by subpoena to answer the bill, or, being called specific parties, must they only disclose the assets?

 Marked 326 bought by the plaintiff from Tayloe and Thornton.

 It ought to be 327.

 The original plan being archetype both of the list exhibited by the plaintiff', and of the copied plan exhibited by the defendants, the agreement of these together, which is exact in all their parts wherein they can bo compared, and those parts are many, and pertinent to the present question, demonstrates the fidelity of the later; for the original plan and the plan said to be copied from it, if they both agree with the list, must agree between themselves.

[The Court of Appeals only say; “ The verdict in the District Court ought not to stand,upon the certificate of the judges that the weight of evidence was against it: since it is unusual for the Chancellor to be satisfied with such a verdict; and though the Chancellor was to judge whether his conscience was satisfied, this Court, exercising their legal discretion on the same subject, see no reason to depart from the general rule, and therefore, talte up the case upon its original merits.” 1 Wash. 337. — Ed.]